Good morning, Your Honors, and may it please the Court, I just wanted to go over, since there are four defendants, we've changed our lineup a little bit. I'll be starting, then Mr. Kroon will go next, Mr. Bartish, and then finally Mr. McKenna will be batting cleanup. I'd like to reserve two of my minutes for rebuttal, if I may. Your Honors, there are two issues which I'd like to bring to the Court's attention today. I'd like to focus first on the gang affiliation, the admission of the gang affiliation evidence, and then if I have time, I'd like to discuss the multiple 924C counts and the double jeopardy problems that arise out of those counts. Turning first to the gang affiliation argument, the evidence of gang affiliation in this case was completely irrelevant to prove the government's case in this matter. And the reason that I say that is that the defense, prior to trial, informed both the Court and the government that there wasn't going to be any objection, and in fact, they were going to admit that all of these folks associated with one another. As a matter of fact, we know that they associated with one another, irrespective of any gang affiliation, because of this Fallen Angels records that they all hung out at, that they all recorded at, and that they all had kind of a club going. Could it still be relevant, even if it wasn't necessary to show? It could still be relevant, but for the stated purpose, it was not relevant, and under the District Court's findings, it wasn't relevant, because if you look at the District Court findings, which are at the beginning of the trial, I believe it starts on page 12 of the first day of trial, the Court finds that this is relevant to show the connection between the parties. And again, the connection between the defendants in this case was never an issue with regards to this trial, and certainly with regards to this particular defendant. So now, even if there's absolutely no relevancy to this evidence, but even if there was some sort of minimal relevancy to this evidence, then you have to do your 403 weighing, and decide whether or not the prejudicial nature of this evidence substantially outweighs any kind of relevance factor that would be involved. And as this Court's aware, in this case, the evidence wasn't an isolated incident like we've seen in some cases. This evidence was pervasive throughout the trial, and it was pervasive in ways that were completely irrelevant to what they were trying to prove. For instance, there was a discussion of tattoos. There was a discussion of the meaning of those tattoos and what they meant to the vice lords. There was a discussion of the different ranks that vice lords have and why they have those ranks. And all of these things, if you take a look at what they were trying to prove, which is that these robberies were occurring and that these people committed these robberies, none of that information went to prove any element related to any of those facts. Were there any curative instructions? There were... And consider this gang evidence or the tattoos or the ranks only for certain purposes. I believe there was a 404B eliminating instruction in this case. I believe it was at the time of the general instructions at the end of the case. It wasn't contemporaneously given whenever this evidence came in. But I do believe that there was. But I don't know that it was specific to this gang evidence can only be used for. It wasn't that specific. It was more of a general use of 404B evidence. Go ahead. Going back to your first point that they conceded being associated with each other, when you have a conspiracy, that sort of concession doesn't really take you very far down the road because it's important for the prosecution to delve more thoroughly into the nature of the relationship, isn't it? I would agree with that. But in this case, you had the two more or less ringleaders of this case. One of the ringleaders, which is Wilnell Henry, who is admittedly one of the masterminds behind this. And then you also had Kirby, who was one of the enforcers that was involved in this conspiracy. Both say that the participation in gang membership had absolutely nothing to do with this conspiracy or these robberies. They both said that. And part of the reason for that is that in this case we had different gangs involved that were part of this fallen angel's record. It wasn't just one gang. There were the four-quarter hustlers of which my client was a member of. There was also this insane, I can't remember the last part of it, but it's the insane vice lords I believe is what it was. And I think that P or Wilnell Henry was a member of that gang. So even if you could try to prove that there has to be this extra connection, it was already proven not only through direct testimony of witness after witness talking about, I knew this guy, we agreed to rob this bank, and by the way, not bank, but rob this convenience store. And by the way, it wasn't a matter of we're going to rob convenience stores on a regular basis. It was, hey, this convenience store is available, do you want to rob it today? It was that kind of a deal. And that again cuts against the fact that somehow the gang membership would require them to be involved in this activity. As a matter of fact, everybody stated that it didn't and the gangs had nothing to do with it. And that's what the problem with this case here is. My client's defense was that, yes, he was involved with these folks in terms of being in Fallen Angels Records, but that it wasn't physically him, he wasn't physically at those locations doing those robberies. And his affiliation with the gang one way or another, or a different gang one way or another, would not do anything to prove any element of the offense to tie him into recognition or ID, which is what they really needed to prove in this case. The second issue that I'd like to address is with regards to the 924C counts. And I think that there's a real issue with both the indictment and the jury verdict form in this case that precludes more than one conviction under 924C. And that is that each of the four 924C counts uses as an underlying basis the conspiracy count in this case. As a matter of fact, it's not only discussed, but it's specific in that it is an underlying factor in all four counts. Didn't the jury have to find for each count a particular other event than the conspiracy, i.e., a particular robbery? They didn't need to, no. Because if you take a look at the jury verdict form, and I think it's on, I think it starts, they did, but they didn't need to. Okay, but does that matter? Well, it does matter because if, in other words, if you start looking at 636 and you have this, he was, this 924C count is count one, count nine, or both, right? Those are the three options that they had in the jury verdict form. And so if they would have picked count one, obviously that's the conspiracy count. They picked both, right? They did pick both. Which means, well, which means that they specifically found that the underlying unit of prosecution was count one, and that's the Taylor case and the Johnson case that I cited to the court. I think they say that the, you don't look at the number of firearms. You don't look at the different kinds of drugs. That's what Johnson is. Johnson was, he had three kinds of drugs and one gun, and they tried to get three 924C prosecutions out of that. There are different robberies. I truly don't understand the point. Sure, sure. If you can help me. Different robberies. They are. And there is a gun used in each of the robberies. So why aren't there separate 924C violations? We would have no problem if the 924C count was tied to count number nine and count number 12 and count number one. Why isn't it? It's not. I don't know why it's not. It's not the way that it was charged by the prosecution in this matter. It's charged to tie to count one and nine, where the jury finds guilt on both. Count one and, I'm making up numbers, ten. Sure, sure. Count one and eleven. So each of those nine, ten, and eleven are separate robberies. They are. But each, but in this case, and my time's up. This is plain air. It is not plain air. There was an objection made, wasn't there an objection made on, it wasn't the objection that I'm making. The double jeopardy claim. That's my point. Yes. Yes. And they find the thing you need to solve the problem. The jury does. Yes. Yes. But the problem that, and I'm going way over my time here. Answer this one question. The problem here is, and I quoted it under double jeopardy, so I'm looking at the Blockburger, right? At a Blockburger test. They have to find that he committed the 924C in, let's say, count ten. And the underlying unit of prosecution was count one. That's what the jury's verdict necessarily concludes, because they checked one and nine, which means it's necessarily, they found that that gun ties into count one, which is the conspiracy. And that's the same unit of prosecution as to every other count.  Thank you. Thank you. And please, the court, I'm Gary Crim. I'm here on behalf of Jordan Ford. Mr. Ford and Mr. Perdue were tried together, so I won't repeat the issues that were brought up earlier. I'd like to reserve three minutes for rebuttal. Okay. There are basically two issues, three issues I want to talk about. One is, there was a stipulation, not a stipulation, the lawyer stipulated a certain, that a whole element of the offense had been established, and the judge then instructed them on that. But the judge never asked Mr. Ford if he was giving up his right to a jury trial on that element. And that is the, so there was no waiver of a jury trial on that element. So this is the way this works, every time you get agreement? I mean, because this happens quite often, that there's agreement about elements, and so then you have to have a, is this a Rule 11 colloquy about giving up the right to a jury trial on that element? Well, it doesn't have to be a full Rule 11, because you're only giving up one right. And secondly, it doesn't happen that often. But you have to bring the individual in. The individual is sitting in the courtroom. Well, it depends when you're doing this. Well, but these are normally made during trial. It's not like you have to have a separate hearing on the stipulation. So what's the case that says, you know, you have to do this? I have no cases that say that. Well, aren't there cases from other circuits that say that? I have not cited any. I tried to stick with six circuits. I think it's basically that what they've done, what the lawyers have attempted to do here, was waive Mr. Ford's right to a jury trial without his consent, without getting his consent on the record. And it could be, it doesn't have to, all there would be is an acknowledgement that you're giving up your right to a jury trial on this element. There's just no risk of injustice to this. I mean, these are different convenience stores. I mean, these are all the objects of the robberies were all by definition interstate commerce. But only by definition. I think that there are limits. By definition? Well, I think there are limits to what, this is, I'm not arguing the interstate commerce issue. I think that that is, the limits on the federal government to prosecute is something I think is in a little more state of flux than other kinds of issues. But the point is that there should have been some acknowledgement by Mr. Ford that he was giving up his right to a jury trial on that issue. You know, normally defendants enter into these stipulations for their own benefit, don't they? So they, I mean, there's, it's typically done strategically by lawyers and by defendants in order to not appear to contest things that are truly not an issue. And I'm not, what I'm questioning is, it was not between, as you said, between the lawyers and the defendants. The defendant would simply never acknowledge that this was being done on his behalf. Well, I mean, you presume in the absence of a showing to the contrary that a lawyer has consulted with his client and acts with his client's consent. But on giving up certain rights, the Supreme Court has said that the record has to show that the defendant made a knowing waiver. And here the defendant did not make a knowing waiver of his right to a jury trial on the interstate commerce claim, the element of the case. So was that the only stipulation that your client is challenging, the interstate commerce element? Yes, I believe that was the only stipulation that was made. The cases that I found were a Second Circuit case, U.S. v. Wellington, and a Ninth Circuit case, U.S. v. Larson, both of which said there should be some kind of inquiry to make sure that the stipulation was voluntarily made and that the defendant understood. Yeah, I think that... Why isn't it not plain error here if we have to struggle to go to other circuits to find the law? Because I'm not arguing... The standard of review on the waiver of a jury trial is a structural error, so that it is something that is not... You don't have to object to it. The same way that you can come into this court and complain about a guilty plea if they don't explain the rights to you... But would it be a structural error if the person is getting a jury trial and everything else, but just not on one element? That's what I'm saying, Your Honor. And what do you rely on for your brief? The structural error... Yes. I have the cases in my brief. I didn't... If it's in your brief, then... Yeah, I talk about structural error in the brief. It's one of the standards of review. Yeah, but what I'm wondering is whether you're talking about structural error as a general matter or if you're generally deprived of a jury trial, or whether you're talking about a case that talks about a particular element. And if you remember, you can answer... I do not believe I have a specific element. I don't think there was any Sixth Circuit law that I found addressing the point, and I did not come up with the two other circuits. You said you had three issues? Well, the second issue was the issue of the defendant's statement, and the government's response to it in part was that we didn't object, and I pointed out that we did object, and the judge basically said, you know, we've addressed the Bruton issue, and we're going to go forward. So the issue there would be the waiver. The government says that they have met the modifications in Bruton by subsequent Supreme Court cases, and in this case, the detective was testifying about Mr. Perdue's statement to him. He said, among other things, he said basically everybody except somebody else, not my client, everybody else was doing it, implying that my client was part of this group that was doing it. And I think that's a... If we have that kind of a statement in the record, that's identifying my client as someone who's participating in the activity. The statement is identifying other people involved but not mentioning your client? No, what he says is all of them, including my client, all of them at the record company, were doing something except, and he mentions Kayon, who was not my client. It was somebody else. I see what you're saying. And your red light is on now. Oh. May it please the Court, my name is Mike Vardish, and I am here on behalf of the defendant, Tyrone Nathan. Your Honor, our issue that we present before this Court today deals specifically with the manner in which Mr. Nathan was sentenced and specifically about how the pseudocounts were used to essentially increase his guideline range from the career-of-primary guideline range of 151 to 188 months to a calculated guideline range of 235 to 240 months. As we indicated in the brief, the increase in this guideline range was caused specifically by the Court using the pseudocounts, specifically the substantive robbery count in which Mr. Nathan was named that were dismissed pursuant to the plea agreement as a means of basically adding five levels to his offense level. We have two positions on this. One is that the Court committed procedural error in calculating the guideline range based really on the plain language of the sentencing guidelines, specifically Section 1B1.2D, and we make specific reference to Application Notes 3 and 4. Our second point was that the manner in which the Court calculated the guideline range was essentially a Sixth Amendment violation. Specifically, the Court conducted its own fact-finding determination in a manner that raised Mr. Nathan's guideline range to a higher level without the benefit of a jury trial. I think what I'll do is I'll address the... How much was it raised by? About seven years. It was a calculated guideline range before the 5K was applied of 151 to 188 to 235 to 240. It basically pushed them almost right up against the statutory maximum sentence. But it was still under the statutory maximum. It didn't change the statutory maximum. It did not. It did not. And that would be... And I understand the... What we rely on in that case is cases such as Gall and Reeder where they talk about in Conister to some extent, a Sixth Circuit case where they indicate that there are situations where when the Court engages in judicial fact-finding and raises the advisory guideline range to a point, the Sixth Amendment issue could be triggered because what it does is it makes a... It changes a guideline... It changes a sentence that is presumptively reasonable without the benefit of a jury finding those facts. So the best cases that you can find for your position are the ones that you just mentioned. Well, true. The cases that we have to support this are... We're using Reeder, Gall, and then the Sixth Circuit one that found where it was really a concurring opinion with Conister where they acknowledged that the Sixth Circuit can be triggered even when judicial fact-finding does not increase the mandatory... the statutory maximum sentence or the minimum sentence in light of a lien. In this case, that's what happened. I guess what we're getting at here is this, is that Mr. Nathan pled to a conspiracy. The conspiracy count was a very general conspiracy account. It wasn't a conspiracy count that lists all these overt acts. It was simply he entered into a conspiracy to commit armed robberies of various businesses. That's because this particular conspiracy statute doesn't require overt acts. No, that's correct. I mean, that's why the government would have charged it in that way. Correct. And the guideline sort of appears to be more easily applicable to 371 conspiracies that do require overt acts than to some of these other conspiracy statutes like 846 and 1961 that do not. I would agree with that. That's part of the issue is where it talks about... When we talk about the application note, and I guess this goes to the procedural reasonable aspect, the language talks all about how the court, the count charging a conspiracy to commit more than one offense, it talks about how we're talking about these counts, we're talking about the additional offenses that are listed within that count. There isn't any additional offenses listed in count one. Count one is simply conspiracy to commit armed robberies from a period of time. It doesn't list any overt acts. It doesn't list these are the robberies that he committed. Now, an argument can be made, well, we're put on notice that these are the acts he committed because they're listed in substantive counts that were dismissed. The point is that those counts were dismissed, and in the eyes of the defendant who's pleading to this count, he's not admitting to any of these other substantive counts. He's admitting that at some point he engaged in a conspiracy to commit various armed robberies and that he committed an overt act in furtherance of it. There's no indication in the plea soliloquy on the plea agreement about what overt acts were committed. There's no stipulation in the plea agreement as to what overt acts were committed. It's just that he committed some. But then when we got to sentencing in this case, the court goes through its own judicial fact finding that, well, Mr. Nathan committed these, you know, essentially eight armed robberies that he finds beyond a reasonable doubt without really any sort of trial whatsoever. He just finds it based on the testimony that listened to at the trial of the co-defendants at which Mr. Nathan wasn't a participant, wasn't available to offer any cross-examination. Did the district judge have to find beyond a reasonable doubt? Well, he did for that application. The application note, yes, he does have to find it beyond a reasonable doubt. The application note that says he has to do it beyond a reasonable doubt. Correct. He stands in the place of the trier of fact. And what happens in the sentencing hearing is the judge does say, I find beyond a reasonable doubt. So it's not a situation, I guess, similar to Bates, where there wasn't a specific determination. The judge specifically said, I find beyond a reasonable doubt. But what he doesn't explain, he doesn't give us any record about why he found beyond a reasonable doubt other than I listened to the trial. But even more importantly. You're not really challenging the sufficiency of that, I mean the basis on which he made that finding. You're challenging the application of the guidelines. For our first argument. Correct. The second argument we're making is the Sixth Amendment argument, the as-is Sixth Amendment argument. That is, the closest Sixth Circuit case, I guess, on point on that, is Conister where it talks about, look, a Sixth Circuit challenge for a sentence that is within the statutory range is alive and is a viable challenge. And what we would submit in this case is, the only thing that drives Mr. Nathan's guideline range up to this 235 to 240 range is the court's judicial fact-finding of his guilt on those substantive counts of armed robbery. If he doesn't... His actual sentence, remind me. His actual sentence, Your Honor, was he had a three-level downward deduction. I believe it was 168. So his guideline range was reduced. You keep pushing on the as-applied Sixth Amendment, the range. But isn't that, forgive me, a little misleading? Well, I'm not trying to be misleading. I think I wasn't trying to be misleading. It's only an 18-month increase over the other guidelines range, which was 120 to 150. I understand that. But the problem, Your Honor, is that the 5K should have been the first thing the judge has to do is correctly calculate the guidelines. The 5K that he received, that three-level 5K reduction, should have been based on a 151 to 188 guideline range, which brings them down, I guess, to a 120 to 150. It should have been found off of a 235 to 240 guideline range. I guess our position would be that the 5K that he received, I mean, is really irrelevant to the argument we're making here because the argument we're making here has nothing to do with the 5K, which is based purely on his cooperation. The argument we're making is based on how the guideline range that basically drives everything here was calculated. In that case, because they used these pseudo-counts, it did increase his guideline range seven years before the 5K is applied. I don't believe the 5K is relevant for this argument. It's separate. Other than the connoisseur concurring opinion, which I remember. Yes, you authored it. Do you have any other cases from any other circuit? We do not, Your Honor. We'll be frank, and I think it's already been directed. I mean, there's cases that cut against this argument, specifically, obviously, Rolls, although I think Rolls is, first of all, it's a second circuit case, and I think the way that they came about that decision in Rolls is completely inconsistent. Essentially, what they did in Rolls is one finder of fact substituted his opinion for the other finder of fact. For that reason, I'd say I don't think it's well-reasoned, and I think what other sort of persuasive authority it has is cut against by when you take a logical look at what happened in Rolls. The jury found the guy not guilty, and the judge essentially said, well, I know that the jury found him not guilty of these substantive counts, but I think he is guilty. I don't think that is a very logical decision. With respect to the Sixth Amendment claim, there was no increase in the statutory maximum. There was no change in the statutory minimum or maximum. That's correct. His range remains the same. It's zero to 20. So the argument, the basis of that argument that we're relying on to be candid is, I guess, Justice Scalia's opinion in Rita and in Gall where the Sixth Amendment should still be triggered when judge found fact increases the guideline range to such an extent that it makes a sentence that would otherwise not be reasonable, based on the guideline range, reasonable because it falls within this new elevated guideline range that is based on facts that were not found by a jury. Thank you. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Tim McKenna arguing for Mr. Henry. I'd like to reserve two minutes for rebuttal. Fine. Your Honors, there's one error in this brief. Another attorney wrote this brief. I'm arguing it for her. She withdrew. The error is procedural in that the district court failed to articulate and calculate the guideline range and the offense level prior to giving the sentence. Originally, there was a level 29 offense level with a guideline range of 151 to 188, 188 months. The defendant was then given a 5K reduction. The district court had set on a record that in his mind he wanted his as a comparable sentence to the appellant defendant, Mr. Nathan, who had the 168 months, and then he proceeds to give a sentence to Mr. Henry. But what the district court never did was calculate the adjusted offense level nor the guideline range once he decided to do that. He gave the original guideline range and the original offense level. Then he gave the 5K but never recalculated what the guideline range should be. Where's the law that even says that the 5K has to be geared to a guideline range? Well, there isn't, Judge. I'm arguing the case that's cited here, that the district court does have to at least make a calculation, and he didn't do that once he gave the 5K. So is the problem that the 5K isn't based on a certain number of levels down? Is that what the problem is? Correct, Your Honor. Why should the district court have to do that? I mean you're outside the guideline range at that point and you're simply making an adjustment based on what you believe the value of the cooperation is. Using the ruling from Novalis, which indicated that the court has to calculate or at least mention the corresponding range, that's what was argued and that's what the error would be based on. And quite frankly, that is the only argument here that is made, is that the court simply didn't reiterate or recalculate what the offense level and guideline range would be after the 5K. Just walk me through this. I've got Judge Yonker's statement in front of me. I'm just trying to make sure I'm grasping your point and his point. So your client's Henry. Judge Yonker's saying I see Henry and Nathan in comparable ways, right? Yes, sir. And so Nathan's 168. Is it just as simple as I'm starting with 168 and I'm going down to account for cooperation in 5K to 150? That's what the court did. So why? What's the problematic part of that? Is it because he doesn't run it through the lens of a new guidelines calculation after you've done the 5K? That's the point? That's the point. What's the rationale for requiring that? The rationale is from the case that's cited as Novalis, Your Honor. But that doesn't deal with this specific context, does it? Well, in Novalis it was a drug case and the court calculated the offense level but then didn't recalculate the guideline range after a 5K was given. So you think it is this specific context? Correct. Are you familiar with this Herrera-Zuniga case? I'm not off the top of my head, Your Honor. Sorry. You know, one way of thinking about this is, in a weird sort of way, it helps your client because if you do what the judge did, the judge doesn't get the presumption of reasonableness. So in other words, if the judge had said, okay, I'm doing the 5K, which is a departure, that now gives me a new range, and hypothetically I'm now sentencing him within this range, that sentence gets a presumption of reasonableness. But when you do it the way Judge Yonker did it, the one thing I would say is I don't think he's entitled to a presumption of reasonableness because we don't know. That's what we sort of argue. We don't know what the new range is. Yeah, but that just means he doesn't get the presumption. It still leaves you with a reasonableness challenge, which, in a way, it's easier for you. You don't have a presumption against you, but it's still a climb. You have to show it's unreasonable. Correct. Well, I'm kind of saying that as, like, is that the way to think about this? That, I mean, the judge is hurting himself to the extent he wants to benefit from the presumption of reasonableness, helping you all, but you don't have to deal with that and challenging the length of the sentence. But I'm trying to figure out what other harm there is. Well, the harm is that we don't know what the sentence would have been had he recalculated it. We don't know what he was thinking at all. You know, had he recalculated it, we would have at least known where the 5K departure was. Right now, all we know is... But without presumptions of reasonableness, how are you hurt? I mean, if it was a variance up or down, we know those aren't presumptively wrong, and so that is a neutral. All that's happened is a potential benefit to affirming the sentence has been lost. I would agree with that. I'm only going by, you know, based on Novalis, on the prior case that was cited was that in that case, the court indicated there was error because after the 5K, the guideline range wasn't calculated. And that is what happened here. The guideline range wasn't calculated. So therefore, when we don't know that, it's what the judge did was not a careful calculation of the appropriate sentencing guideline, and that was a procedural error. That's all we have, Your Honor. Thank you. Thank you. I hate to mess you up, but can I just ask you about this last point? Your Honor? That wouldn't be messing me up at all. I'd be happy to discuss the last point first. So one way of thinking about his argument as well, I mean, it is procedural reasonableness, and I think technically, is it not right that when you do departures, you know, departures come before the end of the range? I mean, you do departures before you decide what the range is. So you have a 5K departure, and then, you know, it seems innocent enough, and it ultimately hurts the judge in a way, but he doesn't tell us exactly what the new range is. I think, I mean, I think logically, Your Honor, that you're making a very good point, and that is, you know, why would this court be willing to provide that presumption of reasonableness to the district court when? Well, we're definitely not, I mean. No, that's what I'm saying. I don't think you get that, but I'm asking, I'm saying from his perspective, well, we have a procedural reasonableness doctrine. Why doesn't this, is your basic point that, well, it's harmless, or is your basic point, well, no, it's not even procedurally unreasonable not to redo the, tell us what the guideline range is after the departure? Well, I guess the way I'll answer that, Your Honor, is I don't think the judge did make an error here, a procedural one. There is no law that requires the court to restate what the new guideline is. In fact, Nivalis. What about Nivalis? Your Honor, Nivalis is, the problem with Nivalis was the court never announced what the starting guideline range was to begin with, and only announced a guideline range after it said it was going to grant a downward departure. So this court had no idea where the starting point was, because the court never found what the starting guideline range was. And that's not what we have here. The court clearly specified what the starting guideline range is. But then didn't specify what the ending guideline range was. Did the court say, I'm granting a 5K1, five levels, or two levels, or what? The court actually said that it believed a four-level reduction would otherwise be appropriate here. So what range would that take? The government's position is that the range that the court settled on was, offense level 26, criminal history category 6, which is 120 to 150. Let me ask you something more just really fundamental about this. I'm sensing, as I hear this discussed by my colleagues in counsel, that you all are living in a different world from the one in which I lived in as a district judge. Of course, admittedly, I haven't been a district judge for 11 years, so I'm conceding that my world might be a little out of date. But in my experience, it's often the 5K1 reduction is tied to a particular guideline range or concept because that's become a more convenient way to discuss it. But I'm not sure that it's even required that the court do it in that way. I mean, you're making a judgment that's inherently different from any judgment that's made in calculating a guideline sentence or in calculating other kinds of departures or variances from it. Am I in a world that no longer exists? Be careful with how you answer that. I don't believe so, Your Honor. You don't believe so, what? I'll tell you what the distinction is. I am aware, just anecdotally, I guess, and there's no record evidence of this, but that other districts calculate their 5Ks differently. Obviously, this is a process initiated by the U.S. Attorney's Office by filing a motion for a 5K departure. Ultimately, it's the judge's discretion whether to give one at all or if to give one, how much to give. If it's not even required that you express it or tie it to a guideline provision, how could there be a requirement that you articulate the guideline? I agree. The point I was going to make is some districts go in with saying, let's take 20% of the sentence off and just do it that way. I thought there was a Sixth Circuit case that said in doing 5K 1.1, you should express the number of levels that you wish to go down. Your Honor, I'm sorry. I don't have the name of the case in my mind, so I may be taking that. I've never had cause to research that particular point of it, and I didn't do it in this case, so I'm not aware of that law either, Your Honor. We just need to do more. Some may be in a different world from Judge Gibbons, but I guess I had this thought that the way it worked was the procedural reasonableness point is you're supposed to have a guideline range. That's the procedural reasonableness point. I thought you didn't have a guideline range until after the 5K. I thought that's why we distinguish between departures and variances, and that's why 5Ks are departures. I guess I just thought that's how it worked. Am I wrong about that? No, Your Honor. It doesn't mean you can't have harmlessness. It doesn't mean other ways to affirm sentences, but I guess I thought... I think conceptually and logically the way to think about it is a 5K is a departure. Section 5K of the guidelines says downward departure. In the departure section. In this case, he didn't state what the final range was, but he did state what his departure was. He did say he was giving him a four-level reduction from where he otherwise thought he should be. One way of thinking about it is even though he doesn't tell us the new range, the information is in the record. It is in the record. That's what he did. Correct, Your Honor. It is. Your position is that he went down four levels to a 26, so the criminal history 6, and came up with a range of 120 to 150, and then sentences him to 150. Correct, Your Honor. That's correct. That is my position. There's a couple of reasons why I say that. First, number one, he began his discussion of what the sentence should be by talking about two things the judge did, and then proceeded to talk about 11 pages for why he gave the sentence he gave. The two things were whether an upward variance was appropriate for Mr. Henry and whether a downward departure was appropriate. At the end of the day, he decided that an upward variance was appropriate because that's when he said, I think he's more along the lines of what Mr. Nathan is. Now, he didn't state what that range was, but he did mention the 168-month sentence. In a 168-month sentence, Mr. Henry's position could only have come from three guideline ranges, Level 28, Category 6, Level 29, Category 6, Level 30, Category 6. Well, he started at a Level 29, so we already knew that. So when Judge Yonker indicated that a variance was appropriate, which he did in the record, the only level that he could have been starting with is at Level 30, and then he actually did say, I'm giving him a four-level reduction. He said Level 29. Level 29 was the starting point. The upward departure would take him to Level 30. So he did a one-level upward departure, and then he did a four-level downward departure. And he said all those things. He just never said, my final guideline range is Level 26, Category 6. You were just using departure both times, which I don't know, maybe I'm the only one that distinguishes these terms, but I thought you only did variances after the 5K. In this instance, the variance was an upward variance. So what? Variances can be up or down. I'm just saying I thought it happened after the final calculation of the guidelines range, which includes any, quote, departures, i.e., 5Ks. I'm just wrong about that. No, you don't have to be, Your Honor. You could say he started at Level 29. He gave a four-level departure to Level 25, and then a one-level departure to Level 26 is the same. So a one-level departure or a one-level variance? One-level variance, Your Honor. That gets us confused. But one basic thing, which I see in your brief, is that you claim that this is reviewed for plain error, correct? No objection, Your Honor. No objection. No objection here. The judge did ask the BOSTA question, and this is the kind of case where clearly the judge could have, you know, if an objection had been articulated that's being articulated now, the judge could say, oh, okay, well, here it is, which I think he did. He just didn't state, you know, that language. I've occupied a lot of your time on this. Sorry. That's all right, Your Honor. I know you have a voluminous brief that addresses all of these issues. I guess what I'd like to do is address the issues that they talked about, and if you have any other questions about the other issues, I'd be happy to answer them. Going back to start with regard to Mr. Ford's – I'm sorry, Mr. Perdue was first. Yeah, the gang thing. It seems highly prejudicial to have all this gang testimony in there. And, Your Honor, evidence typically is prejudicial against the defendant. In this case, it wasn't unfairly prejudicial, nor did that – even if it was arguably unfairly prejudicial, it didn't substantially outweigh the probative value of the evidence. Mr. Perdue and Mr. Ford want to cast the case as they want this court to see it. But the problem with that is that the evidence in the record doesn't support that, and that's not what this case was about. This case, the gang evidence was relevant, and it was probative, highly probative, on a couple of key points. And that is to distinguish – to answer your question that you asked, Mr. Shadd, the judge did instruct and give a limited instruction, and it's on page 21 – page ID 2151 of the record. And there was no objection to the content of that limiting instruction? There was not, Your Honor. And the instruction was, you have heard testimony that the defendants committed crimes, acts, or wrongs other than the ones charged in the indictment, and that the defendants participated in gang activity. If you find that the defendants did these things, you can consider the evidence only as it relates to the government's claim on that defendant's intent, motive, opportunity, or plan to participate in the criminal activity charged in the indictment. You must not consider it for any other purpose. So the judge specifically told the jury what it could consider this evidence for, and that was consistent with the government's theory of the case was, and that is these defendants were motivated to participate in this criminal activity in part by their affiliation and association with these guys in relation to the Vice Lord Street Gang. They were the ones that... Why wasn't the affiliation with the record label enough? Well, because there were other people that were there performing rap music that weren't affiliated with the criminal activity, and they weren't affiliated with the gang either. So there was a legitimate side to this business, but there was an illegitimate side to it. And these guys that bond is a significant distinction because, as this court has noted, in criminal conspiracies, they're secretive. You don't put that stuff out in the open. And so the government has allowed some latitude to be able to prove those secret ties. And the secret ties here amongst these defendants and the way they were situated was this gang relationship. It was what they wanted to do and what they wanted to be, and it was the image they presented themselves as, these young guys. And that's a distinction that maybe was not finally made by Mr. Ford and Mr. Patu in their briefs. Mr. Henry and Mr. Kirby, who on the stand during cross-examination, said, yeah, the gangs didn't really have anything to do with it. They're the older guys. They're past all of that. But Mr. Payne, another co-conspirator that testified at trial, said the gangs did have something to do with it. There was evidence in the record that he said the gang status and the status in the gang was enhanced by committing these robberies. And your credibility to perform this rap music was enhanced by committing these robberies. You had the credibility to rap about this stuff because you were actually living that life and doing those acts. And that was the light that the government cast this evidence in at trial, both as it was presented and then in closing argument. It wasn't they were part of a gang so they were committing crimes. It was there are two guys here that you see in these surveillance photos, these mass assailants, who multiple people have come in here and said they were these two defendants. What would be a motive for them to be a part of that? And it was the motive that they were presenting themselves. And then you see their pictures on the internet that they posted, wearing bandanas, flashing the gang signs. It was all inextricably intertwined with one another. It wasn't something you could separate. They were wearing bandanas over their faces in these photos while they were flashing these gang signs. They're disguising their appearance the same way they were disguising their appearance during the robberies. You need the tattoo and evidence. The tattoos, Your Honor? Have your opponent objected to that specifically? Well, for one, Mr. Perdue, the tattoo you could not have not seen. It was on the side of his face, prominently displayed. In fact, the way he was sitting facing the jury, they would have seen it the entire trial because it was on the left side of his face and his face was to the jury and that particular courtroom is to the left. The tattoos were significant from the point that they explained the bond, the tie to the gang. They were the ones that went out. Essentially, it's an affirmative statement by them saying, I'm a part of this gang. I've put their precepts on my body. That's how tied into the gang I am. I didn't make that argument at trial, but that's essentially, I mean, that was all part of explaining their connection to the gang and it didn't go any further than that. The judge's limiting instruction informed the jury of that, that that's what they were used that evidence for and nothing more. Quickly, with regard to the 924C counts, the superseding indictment record number 77, each 924C count of which the defendants were convicted of in this case does specifically tie that 924C count to the conspiracy and an underlying robbery. Each count does this. Then in the jury verdict form, and we were very meticulous about this because I think it does make a difference if the jury found that it's only supported. If the jury found on each of these 924Cs that the only reason they were finding that it was in furtherance of the conspiracy and nothing more, then... There would only be one. That's correct, Your Honor. Okay, so why did you tie it to both the conspiracy and the underlying robbery in each of these ones? Was there some affirmative reason why you did it that way? Yes, Your Honor. The reason is, and it really isn't particularly relevant for these two defendants because they went to trial, but when you draft an indictment, you don't know who's going to plead guilty and who's going to go to trial. Mr. Henry, for example, was charged in almost all of those counts as well, although he didn't participate in any of those robberies. It was the government's theory that he would be liable for those 924Cs under a Pinkerton theory of liability. Hence, it was necessary to specify directly in that manner that they were linked to Count 1. And that's the reason, Your Honor. There's really no other explanation for it. And we spent a great deal of time carefully crafting the jury instructions with regard to these counts and the special interrogatories so that we would know, and this Court could be assured, of what the finding actually was with regard, because it's serious business. These sentences are serious, and the government recognized that. Well, if, let's say, there was a conviction on the conspiracy count but not a conviction on any of the substantive counts, in that situation, and the 924Cs had been piled, well, that couldn't be done. Mr. Shadd's argument would have validity if that were the scenario. Correct, Your Honor. But that's not the scenario. Correct. Maybe the jury verdict form was overly detailed and didn't have to be as detailed as it was. That's why it's structured as it is. It was, Your Honor, exactly why it was structured as it was. With regard to that, just a final note, I did file a 28J letter on Monday that noted, and I know Judge Sutton sat on the panel, that dismissed or affirmed the conviction of the co-defendant, Vladimir Manzo Zamora, in this case. He was tried in a separate case, and a separate panel of this Court affirmed those convictions. That was an unpublished order. Correct, Your Honor. But I just wanted the Court to be aware that it existed, and this exact issue on the 921C was raised in Mr. Manzo Zamora's case. I mean, the posture of it is the same, even if the counts are a little bit different, because Mr. Manzo Zamora was charged in the same indictment as these two. In fact, one of the counts is the same as an account that Mr. Ford was also convicted of. With regard to Mr. Ford and going to the stipulation, and I think Mr. Krim and I have a fundamental disagreement about how this argument is structured. In my mind, Mr. Ford did have a jury trial. It lasted two weeks, nine days, and there was... Why shouldn't we say that if somebody is going to stipulate to a particular element, that that defendant should at least be advised by the Court that that means he is not going to get a jury trial as to that element? Well, Your Honor, well, a couple of things. First of all, I'm not saying that it's necessarily a bad idea to require that. I mean, that would remove any question of what a defendant knowing... I mean, it would save probably a lot of trouble on the 2255. Right, because the defendant may come and say, hey, my lawyer did this without talking to me, and I never would have stipulated to this. Right, and now we have the direct record evidence. In fact, I will tell you, my personal practice in the military, when we stipulated deep into facts, there was an inquiry made with the accused in those cases, and that was a rule that was in the Manual for Courts Martial. But there is no law here that requires that to take place. And it wasn't raised, obviously, at the trial, so that we would then say it's reviewed for plain error, and there isn't plain error because the law wasn't clear at the time. That's correct, Your Honor. And your opponent's argument was it's structural error, and he didn't have a case, except maybe there's one in his brief. He, as I recall, there's a litany of cases that he cites for the idea of how a court reviews cases for constitutional error and defines structural error as being a pervasive error that occurs throughout the trial. And the government doesn't concede that this is a structural error. This case, if anything, it's a problem with the instruction, if anything. And I'm not conceding that there is a problem with the instruction. But if anything, that's what it is, and the instructions were reviewed at trial. Mr. Ford's counsel had the opportunity to object to the instructions, and he did not do so. And then the judge instructed the jury. And I think the Jones case lays a little bit of the framework here for this court's review in how, you know, whether this is a, you know, did the court direct a verdict or did they not direct a verdict. And I think the instruction here is significantly different than the instruction in Jones, in which the majority of the ombud panel in Jones presumed error, and the concurrence actually found error with the instruction there. But the instruction there listed, you know, gave the element, it was a felon in possession case, and the stipulated element was the prior convictions, which is not all that unusual in those types of cases. Felon in possession, he had prior felonies, he stipulated to that, and the court told the jury in relation to its instruction on the element itself that that element's been proven. Here, and I'll concede that this instruction, as it was formulated, it was formulated by the court, this isn't the draft instruction the parties provided, and there was never any discussion about it with the court, but I can only presume, and it's a presumption, that Judge Yonker was aware of Jones and how to deal with the stipulation, because the instruction here is tailored significantly in that the elements are given, the jury is told that they have to find these elements beyond a reasonable doubt. Then, in the definitional section of the instruction is where Judge Yonker points out that this fact of interstate commerce has been stipulated to, and he does tell the jury that the fact is established, but then, after those definitions, he reminds the jury that they have to find the elements beyond a reasonable doubt. So, the instruction distinguishes between facts and elements, and I don't think that's a distinction without some significance. Again, there was no objection here, so there was no discussion in the lower court about how this was drafted, and I don't think there was any error here. At most, if there was error, it certainly didn't result in a situation where this court should exercise its Rule 52 discretion to overturn the conviction on this point. Significantly, there actually was testimony from the agent right after the stipulation was read that he had, in fact, investigated the victims, had done the interstate commerce investigation to determine that they did deal in commodities that traveled in interstate commerce. We didn't have to put anything more on that, and I think it's significant that, as I think it was Judge Sutton asked, I mean, that's not what the trial was focused on, so that's why we stipulated to it, not to distract the jury on what the real issue was. The real issue was, was Mr. Ford the person under one of those masks? It wasn't, you know, did the Rice Krispies at that convenience store sold travel in interstate commerce? That wasn't the issue. With regard to the Bruton issue, again, this was an issue carefully addressed, and the government took pains to ensure that the agent wasn't, we were aware that there could be a Bruton issue here with Mr. Perdue having given this prior court, this out-of-court statement prior to trial, and if he didn't testify, obviously that would present a problem for Mr. Ford. And any, we followed the Bruton progeny, Richardson and Gray, and identified those areas of the statement that were problematic and changed them in such a way that they didn't either, they didn't name Ford as being involved, and they didn't facially implicate him as being involved. Didn't they suggest that he, lead to the impression that he was one of the people that was being referred to? Well, I think this one statement that the only person that wasn't doing it is this Kayon Nick. That statement, if there were any other references in Ford, in Perdue's, in the evidence we introduced of Mr. Perdue's statement, that mentioned Mr. Ford in any manner, I think then you could say, well, yeah, maybe that facially implicates Mr. Ford in that statement. But that's how you have to look at it. That's what the cases say, is that you can't link it to other evidence that may or may not have been introduced at trial. You can't say, well, there was this other witness that testified that Mr. Ford was at the house all the time, so he must be one of those other people that Mr. Perdue was talking about, and that the agent said Mr. Perdue was talking about. That's not the law. The law says it has to facially implicate the co-defendant without linking it to any other evidence in the case, and that's the distinction here, Your Honor. With regard to Mr. Nathan's appeal on the pseudo counts, the judge did exactly what the guidelines instruct the judge to do, and admittedly there wasn't a lot of case law out there to show how this is applied in the way that it is, but Robles from the Second Circuit did provide that roadmap, and it seemed to be consistent. It discussed the application notes 3 and 4, which are the critical ones to Section 1B1.2d. When you're dealing with a conspiracy conviction, you have to determine what the objects of those conspiracies are in order to properly calculate the guidelines, and in this case it was a robbery offense. You're not going to have a problem like this in a drug case, and despite the fact that 846 doesn't require overt acts like 1951 doesn't require overt acts, the difference here is that the guidelines under Section 3 specifically exclude robbery from the grouping rules, whereas the drug offenses would be included. That's probably one of the reasons why you don't see a lot of cases on this issue, is because a lot of the offenses that we have conspiracy cases on are grouped, and when they're grouped, this rule doesn't apply, so you're not even in 1B1.2 if the offenses are grouped. In this case, the judge did it. To answer Judge Sutton's question, it was a four-level increase from what the initial guideline was into the application of this pseudo-count application to get him to level 33, which was 235 to 240, but significantly, I think Mr. Nathan has every right to make a challenge under the Sixth Amendment here, but I don't think the Sixth Amendment was violated, and I think Elaine chose that. Here, Elaine reiterated the point that we're not changing the statutory maximum here, and there was no statutory minimum. It was a zero to 20, and it ended as a zero to 20, and the judge did exactly what the guidelines told him to do, and that is find what those object offenses are and find whether they occurred beyond a reasonable doubt, and that's what he did. He put that in, and he made that finding on the record. So there is no error here, and Mr. Nathan did preserve the error, but there just wasn't one. So even under abuse of discretion standard, there isn't any problem with what the court did with his sentence. We had addressed Mr. Henry's argument. We had addressed his argument first. In my brief set, I didn't think oral argument was necessary. I know I have 40 minutes and I have 10 left, but unless the court has any specific questions about any of the remaining issues, I didn't intend to use all my time if I didn't have to. Thank you. The government asks that you not give credit to two of their own witnesses with regards to this gang affiliation testimony. They say don't credit Mr. Henry and Mr. Kirby even when they said that the gangs have nothing to do with this offense, even though they provided five K's to Mr. Henry and Kirby because of their truthful testimony at the trial. They say don't look at that. Instead, look at Mr. Payne's testimony because Mr. Payne clears it all up for us as to how this ties in with the gangs. Mr. Payne, on page 1220 in its trial volume 6, says that he wasn't giving money to PNEV from the robbery. PNEV is identified as the universal elite, the person that's running the show in terms of the gang. If the gang is the one involved, and it's the reason the question was asked, why isn't he getting money from these robberies? The answer is because it wasn't a gang issue. It was these folks at Fallen Angels that were getting together and doing this. Second, Payne testified, and it's on 1198 of the same transcript, that if you're a gangster rapper, you need to walk the walk. You may not think that's a distinction, but being a gang member and a gangster rapper makes all the difference in the world in this case because we're talking about the association with Fallen Angel Records, which was a gangster rapper record label. And that was the group that was involved here. And finally, you have to remember that with regards to this particular issue, the court on page 12 made the finding that this evidence was necessary in a cited to Gibbs, the United States v. Gibbs case, and it's where the interpersonal relationship was the central issue in the case. That's the exact language that was used. Here, the interpersonal relationship was already admitted by the defendants, already conceded by the defendants. Not only wasn't it the central issue in the case, and as the government just admitted, the central issue in the case was identification. It's not interpersonal relationship. It's was that the guy that's on the video. Your red light is on. Thank you. Thank you. Thank you. On the issue of the waiver of jury, I believe that we cited the Hereford case, which was in terms of discussion of structural error. And in that case, it talked about the right to a jury trial as being a violation of that is a structural error. And that would take it out of a plain error standard into a structural error standard. We discussed it in our brief. Thank you. Other than that, I have no further questions. Great. Any other rebuttal? Just briefly, just as far as the calculations go, I would bring up 1B1.17 where you're required to calculate the range under the guidelines. Just bring to your attention the language of Novalis. After the court found procedural error, after the court below did not calculate the range, after the court said the offense level is 25 and the category is 4, and then this court wrote, but the court then failed to complete the calculation or the corresponding ranges. And that was procedural error. And I would just point out that's what happened here. Thank you. Thank you. Thank you all for your argument. And I understand that at least three of you are Criminal Justice Act lawyers, and we thank you for your representation of your client and public interest. And thank you all for your argument. The case will be submitted, or the cases will be submitted, and to the clerk, recess courts. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.